**In the Matter of the
WELFARE OF M.M.**

**No. C2–88–1684.**

Supreme Court of Minnesota.

March 2, 1990.

Seth R. Phillips, Blake & Phillips, Newport, for appellant.

Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. Ramsey County Atty., St. Paul, for respondent.

Michael F. Cromett, Asst. Ramsey County Public Defender, St. Paul, for Guardian ad litem.

COYNE, Justice.

On petition of Joy Wells, the maternal grandmother of the subject child M.M., we review a decision of the court of appeals affirming the transfer of the guardianship and legal custody of the child to the commissioner of human services. *In re M.M.*, 436 N.W.2d 827, 829–30 (Minn.App.1989). We reverse.

The record discloses that M.M. was born in September 1985 to Mary E. Miller and an unknown father. Presumably because of her later diagnosed "bipolar affective disorder with psychotic features and borderline personality disorder" which manifested itself shortly before M.M.'s birth, the child's natural mother abandoned him at the hospital two days after his birth. Joy Wells, the child's maternal grandmother, immediately assumed parental responsibility for the child who has now resided with her and her husband David Wells [1] during the entirety of his 4½ years. Mary Miller has never cared for the child or exercised any other parental prerogative.

The Ramsey County Community Human Services Department ("county") initially became involved with the family when Miller continued to experience psychological difficulties and became pregnant with her second child, A.M., two months after M.M.'s birth. After A.M.'s birth, both Miller and A.M. were placed in a county shelter. On November 6, 1986, the county filed a comprehensive petition with the district court seeking authorization to place A.M. in foster care and to take temporary legal custody of M.M. Wells intervened requesting an order granting her legal and physical care, custody, and control of M.M. A guardian ad litem was appointed to represent M.M.'s interests. By amended order of December 10, 1986, the district court granted the county temporary legal custody of both children, placing A.M. in foster care [2] and permitting Wells to retain physical custody of M.M. while the county assessed her parenting skills.

After completion of its study, the county petitioned the district court on February 2, 1988 to terminate the parental rights of Miller and the alleged father to M.M., pursuant to Minn.Stat. § 260.221, subds. 4 and 5 (1988) and to transfer the guardianship and legal custody of M.M. to the commissioner of human services.[3] In addition to providing the factual allegations necessary to support the statutory termination

1. The court was notified that David Wells died on September 21, 1989—before the time this matter was orally argued to this court.

2. A.M.'s significant physical problems require specialized attention, and the foster home in which he resides is equipped to provide that care. Ultimately, by order of October 2, 1987, Miller's parental rights of A.M. were terminated. Guardianship and legal custody of A.M. were transferred to the commissioner of human services, and A.M. is not involved in these proceedings.

3. Miller voluntarily agreed to the termination of her parental rights to M.M., and the parental rights of Miller and M.M.'s alleged father were terminated by orders of the district court dated, respectively, July 13 and July 14, 1988. Those matters are not at issue on appeal.

grounds, the petition alleged a factual basis to support the county's recognition of M.M.'s attachment to his grandmother and the quality of his current care, and it urged careful consideration of his long term needs and best interests.

A hearing on the county's petition adduced testimony from those individuals who participated in the parenting skills evaluation and from the guardian ad litem. In addition, the district court heard testimony of Joy Wells and her husband David, their friends and neighbors and M.M.'s early childhood teacher. The district court's summary of the testimony of the county's witnesses alone, together with its statement of the natural mother's custodial preference, constituted its findings of fact to support its conclusion that M.M.'s best interests required the transfer of his guardianship and legal custody to the commissioner. The court of appeals affirmed and we granted Wells' petition for further review.

We entertain review to consider first, the nature of the analysis required upon application for legal custody by a child's relative other than a biological parent and then, the adequacy of the district court's findings of fact to support its determination.

It has long been a familial phenomenon that the absence, inability or incapacity of the natural parents to provide and care for their children has prompted other relatives to step forward to assume the benefits and responsibilities of that role. While at one time, judicial intervention was unnecessary, a body of common law developed according a custodial preference to near relatives. *See State ex rel. Waldron v. Bienek*, 155 Minn. 313, 315, 193 N.W. 452, 452–53 (1923).

■ Today there remains a strong preference to award the permanent care and custody of a child to a relative if either or both of the natural parents are unable to perform that responsibility. *See* Minn.Stat. § 257.02 (1988). In fact, on examination of the cumulative legislation addressing the many aspects of child custodial concerns, it becomes clear that the legislature has strongly endorsed the societal goal of strengthening and preserving the biological familial structure. Most illustrative of its position is Minn.Stat. § 256F.01 (1988) which provides as follows:

It is the policy of this state that all children, regardless of minority racial or ethnic heritage, are entitled to live in families that offer a safe, permanent relationship with nurturing parents or caretakers and have the opportunity to establish lifetime relationships. To help assure this opportunity, public social services must be directed toward accomplishment of the following purposes:

(1) preventing the unnecessary separation of children from their families by identifying family problems, assisting families in resolving their problems, and preventing breakup of the family if the prevention of child removal is desirable and possible;

(2) restoring to their families children who have been removed, by continuing to provide services to the reunited child and the families;

(3) placing children in suitable adoptive homes, in cases where restoration to the biological family is not possible or appropriate; and

(4) assuring adequate care of children away from their homes, in cases where the child cannot be returned home or cannot be placed for adoption.

*See also* Minn.Stat. § 260.011, subd. 2(a) (1988).

In the present case, upon the termination of the parental rights of M.M.'s only known living parent, the district court was statutorily authorized to transfer M.M.'s guardianship and legal custody to the commissioner of human services, to a licensed child placement agency, or to an "individual who is willing and capable of assuming the appropriate duties and responsibilities to the child." Minn.Stat. § 260.242, subd. 1 (1988). In identifying the guardian and custodian, compliance with Minn.Stat. § 260.181, subd. 3 (1988), which defines an order of placement preference, is mandated. Section 260.181, subd. 3 provides in pertinent part as follows:

**Subd. 3. Protection of racial or ethnic heritage, or religious affiliation.** The policy of the state is to ensure that the best interests of children are met by requiring due consideration of the child's minority race or minority ethnic heritage in foster care placements.

The court, in transferring legal custody of any child or appointing a guardian for the child under the laws relating to juvenile courts, shall place the child, in the following order of preference, in the absence of good cause to the contrary, in the legal custody or guardianship of an individual who (a) is the child's relative, or if that would be detrimental to the child or a relative is not available, who (b) is of the same racial or ethnic heritage as the child, or if that is not possible, who (c) is knowledgeable and appreciative of the child's racial or ethnic heritage. The court may require the county welfare agency to continue efforts to find a guardian of the child's minority racial or minority ethnic heritage when such a guardian is not immediately available. For purposes of this subdivision, "relative" includes members of a child's extended family and important friends with whom the child has resided or had significant contact.

If the child's genetic parent or parents explicitly request that the preference described in clause (a) or in clauses (a) and (b) not be followed, the court shall honor that request consistent with the best interests of the child.

▪ Thus, the legislature has directed that the designated order of preference must be followed unless good cause exists to avoid the preferential placement first with an available relative—here, the maternal grandmother who claims to be both willing and capable to continue her "parenting" role. The statute imposes on a party seeking avoidance of the statutory order of preference the obligation to make an affirmative showing that the first preferred placement would be detrimental to the child. While the term "detrimental" is not statutorily defined, we construe it to encompass either a demonstrated actual injurious impact of the relationship on the physical or emotional well-being of the child or a showing to a reasonable degree of certainty that the facts and circumstances of the proposed placement pose the substantial likelihood that actual harm will occur. That the legislature did not include the best interests of the child standard in this portion of the inquiry is indicative of a subtle shift in the perspective from which applicability of the preference is to be viewed and the criteria by which it is to be tested. *See, e.g.,* Minn.Stat. § 260.191, subd. 1a(a) (1988).

▪ In application of this analysis to the recorded facts, we first comment that the district court's findings of fact are deficient. While considerable testimony was taken from 10 witnesses, the trial court merely recited or summarized excerpted portions of testimony of several of those witnesses without commenting independently either upon their opinions or the foundation for their opinions or the relative credibility of the various witnesses. It made no specific findings with regard to Wells' past or present ability to fulfill parental responsibilities and instead only concluded, without reference to the basis therefor, that the "best interests" of the child would be advanced by a placement with the commissioner. Standing alone, the "findings" are inadequate to facilitate effective appellate review, to provide insight into which facts or opinions were most persuasive of the ultimate decision, or to demonstrate the trial court's comprehensive consideration of the statutory criteria. *Cf. Moylan v. Moylan,* 384 N.W.2d 859, 865 (Minn.1986).

▪ In this extraordinary circumstance we have undertaken an independent review of the record, and we are satisfied that the county did not sustain its burden of demonstrating an actual negative or detrimental effect of the present custodial arrangement on the child or the substantial likelihood that a detriment will occur by a continuation of custody. In so ruling, we acknowledge the expressed concerns relating to Wells' difficult personal history in the parenting of her own children and her poten-

tial inability to control stressful situations certain to arise as M.M. matures and asserts his independence. Moreover, it is conceivable that the recent death of David Wells will have an impact on the custodial arrangement as it had existed since the time of M.M.'s birth and his integration into the Wells' family unit.

Most of those witnesses expressing an opinion as to a transfer of custody to the commissioner were ambivalent. Wells has, however, demonstrated constant and continued love for the child, considerable cooperation with county officials and an ability to provide a safe and suitable environment for the child, and her efforts cannot be minimized, particularly in light of the statutory placement preference. As we had the occasion to observe recently in a different, but nevertheless instructive context,

> the golden thread running through any best interests analysis is the importance, for a young child in particular, of its bond with the primary parent as this relationship bears on the other criteria, such as the need for "a stable, satisfactory environment and the desirability of maintaining continuity" and "the mental and physical health of all individuals involved." Usually this relationship "should not be disrupted without strong reasons" * * *.

*Maxfield v. Maxfield*, 452 N.W.2d 219 (Minn., 1990) (citations omitted).·

Accordingly, we reverse the decision of the district court transferring the guardianship and legal custody of M.M. to the commissioner of human services. We find it necessary to comment, however, that our decision today does not include or compel the granting of Wells' petition for legal custody of M.M. and instead contemplates a reinstatement of the order granting to the county temporary legal custody and a retention of physical custody by Wells. There are many courses of action available to the county, including the continued monitoring of the developing relationship or the foundation of a specific plan designed to assist Wells in enhancing existing parenting skills or acquiring new skills by which she might ultimately attain full guardianship and legal custody of the child.

Reversed.